| | | |
|---|---|---|
| **MICHELE M. RUSSELL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **ORDER** |
| | ) | |
| **BSN MEDICAL, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**THIS MATTER** is before the Court on the defendant's motion for summary judgment (Doc. No. 24) and the related briefs and attachments in support and opposition. The matter is now ripe for the Court's determination. For the reasons set forth below, the Court will **GRANT IN PART and DENY IN PART** the defendant's motion.

## I. BACKGROUND

BSN medical, Inc. ("BSN"), is a medical device company that employs an extensive U.S. sales force. Plaintiff Michele Russell's relationship with BSN began in 1991, when she began working as a sales representative for Parker Medical, which later became Smith & Nephew. Both Parker Medical and Smith & Nephew were BSN predecessor companies.

In February 2007, Russell, still serving as a sales representative for BSN, attended a BSN sales training weekend in San Diego, California. During that weekend, Russell attended a group dinner with eight other BSN employees. She was the only female present at the dinner. Russell claims that when she arrived at the party's restaurant table, the only available seat was at the head of the table. She maintains that when she went to sit down, Ken Krull, a sales representative at the time, told her "no girl" sits at the head of his tables, which was met with laughter and loud

comments from others at the table. (Doc. No. 29-3 at 12). Russell alleges that throughout the dinner, Krull led or contributed to an inappropriate conversation including topics such as sex acts, bestiality, strippers and strip clubs, and Tijuana sex shows. Upon Russell's twice objecting to the conversation, she maintains that the men left her at the dinner table and went to the bar to continue the conversation. Russell alleges the conversation continued throughout the van ride back to the hotel, and that she was so visibly upset that the driver of the van escorted her part of the way back into the hotel.

That night, Colin Cashin, a BSN manager who was in the van and at the dinner, reported to Gary Keytel, Vice President of U.S. Sales, that Krull had "been particularly rude and displayed behavior" that BSN did not find acceptable. Keytel called Russell the next day and instructed her to report any inappropriate behavior to management. Russell informed Keytel of the events of the group dinner. Both Cashin and Keytel informed Krull that they were "disappointed" with his behavior, and Cashin requested that Krull apologize to Russell. Russell alleges that thereafter, Krull approached her in an aggressive manner and asked "what the 'fuck' she had said to Keytel to get him in 'trouble.'" (Doc. No. 29 at 4).

Russell claims that after the incident in San Diego, whenever Krull would come into contact with her, he would echo a similar refrain to his earlier confrontation.[1] On one occasion, during a sales meeting in 2008, Krull allegedly commented on Russell's black nail polish and told her that he thought her nail polish was inappropriate and an "outward sign" of her "overly aggressive" nature. Russell claims on various occasions Krull called her a "stupid girl," the "girl that fucked up

---

[1] Russell contends she saw Krull at approximately four meetings in 2007, and approximately four meetings in 2008. She also had extensive phone and email contact with Krull after he became her direct supervisor in February 2008.

his professional life," and stated, "Boy, you have one girl at a dinner . . . ." (Doc. No. 29-3 at 13).

Russell complained to Keytel more than ten times by phone, between three and five times in person, and more than once via email. Keytel admits Russell's complaints about Krull were "fairly regular." (Doc. No. 29-12 at 7). When Russell complained to him on one occasion, he states that he "didn't take it as a real serious situation" because she "never looked very distraught or in tears or like she was in any way traumatized." (Id. at 8).

In February 2008, Krull received a promotion to the position of Field Sales Manager for the Southern Region, which included Russell's territory of Texas. Krull thus became Russell's direct supervisor, and he reported directly to Keytel. Within a week of interviewing for the position, Krull sent Russell an email at 7:11 p.m. on a Friday evening stating that she was "behind the curve" and that he had "no defense or explanation for [her] performance." (Doc. No. 29-4 at 58). In the same email, Krull requested that Russell provide him with an improvement plan "by this weekend," and that he was reporting her status to Keytel on Monday. (Id.).

On February 27, 2008, Krull emailed Cashin and told him Russell was a "slacker." The subject line of the email was "Michele Problem." (Doc. No. 30 at 2). Two days later, on February 29, Krull emailed Keytel about a customer issue with Russell. Krull wrote, "Note the positioning [of] Michele below[.] She is trying to put one over on me – Blatant LIES." (Doc. No. 29-6 at 2). At the end of the email, Krull wrote, "Michele is clearly not being honest with us and is digging herself into a deep deep hole. I am beginning the recruiting process for her territory." (Id.). Russell disputes Krull's allegations of her dishonesty.

On April 11, 2008, Russell sent an email to Keytel detailing her concerns about Krull's alleged retaliation and harassment. The email states, in part:

> I have been made to feel that Mr. Krull's continual, merit[-]less accusations

are a retaliatory smokescreen that is ultimately based on historical situations of harassment that began in San Diego (2007) . . . . I realize that Mr. Krull is an inexperienced manager in terms of employment relations and as such, he should be allowed a learning curve. However, it is unacceptable that he be able to create a hostile work environment within a corporate setting. I should not be put in a situation where I am under constant attack by Mr. Krull. . . . It is improper for Mr. Krull to repeatedly misrepresent me to my peers and administration.

. . . Mr. Krull's continued treatment towards me and in my opinion harassment, needs to be addressed by BSN management.

It is my objective to spend my time furthering the success of BSN and its market goals; not constantly defending myself from unfound attacks by my [supervisor].

(Doc. No. 29-6 at 5).

The next day, on April 12, Keytel forwarded this email to Krull. Then three days later, on April 15, Krull sent Russell an email entitled "Performance deviation report – Michele Russell." (Doc. No. 29-4 at 2). It contained a copy of a "Performance / Integrity Report" (the "Report"). The Report states that it was submitted to Keytel for review and details Krull's observations of Russell's shortcomings as a sales representative. In a conference call on the same day with Krull and Keytel, Russell was told that she was on probation.

On April 18, 2008, Russell responded to the Report in a formally written email, which she sent to Keytel, Krull, and John Poag of human resources. Russell cited some of her alleged successes as a sales rep over the years at BSN, and she responded to some of the allegations Krull had detailed in the Report. Also on April 18, 2008, Russell filed a charge of discrimination (the "Charge") with the Equal Employment Opportunity Commission ("EEOC"). Russell essentially alleged in the Charge that she reported sexual harassment to Keytel, and that as a result, Krull retaliated against her over the course of the subsequent year.

On April 19, 2008, the day after Russell filed the Charge, Keytel emailed her and told her "I expect to see a turn around . . . . It's very simple, get your sales numbers up . . . . I want to see

4

concrete sales and area coverage plans and a quick performance upswing." (Doc. No. 29-6 at 7).

As early as April 21, 2008, two days after Russell filed the Charge, Krull began working with a third-party recruiter to locate candidates for a sales rep position with the same job description and territory as Russell's. Roughly a month later, Krull received an email from Russell reporting her recent positive sales activity. Krull forwarded Russell's email to Keytel and remarked: "How do you want me to handle the response to this[?] I was concerned about a performance upswing adding leverage to her position." (Doc. No. 29-13 at 41). By June 12, Krull notified the recruiter that BSN needed to postpone looking for a candidate for the position because he was having "issues separating the current rep." (Doc. No. 29-19 at 13).

Later that year, on August 5, 2008, Krull received an email from a customer, who wrote to Krull that he had been unable to reach Russell at the phone number 407-803-1144 after calling several times and leaving messages. The number the customer listed, however, was Krull's own telephone number. Before forwarding the email to Keytel, Krull changed the number from his own to Russell's, which made it look as if the customer reported not receiving a response after having called Russell's number rather than Krull's. Krull maintains he was merely correcting the customer's typo, and that the customer had in fact called Russell's phone. Russell alleges Krull had BSN's customer service re-route her customer calls to Krull, in a deliberate attempt to make it look as if she was unresponsive to customers.

On September 10, 2008, BSN informed Russell that her employment would be terminated effective October 10, 2008. In the termination letter, signed by Keytel, BSN listed its reasons for Russell's termination. These reasons included customer complaints, lack of responsiveness to customer and BSN requests, failure to turn in basic sales information, turning in a monthly report late, and missing a portion of a mandatory monthly conference call. The letter details Russell's

alleged poor performance in two sales promotions: the DLP (Hawaii) Challenge Program and the Cast Saw Picture Promotion. The latter involved sales representatives photographing old cast saws their clients owned, and then submitting the photographs to BSN. Among the customer complaints listed in the termination letter was the complaint in which Krull altered the telephone number in the email before sending it to Keytel. Keytel stated at deposition he had no knowledge at the time Russell was terminated that Krull had altered the email.

Russell amended her EEOC Charge on September 23, 2008 to reference the termination as another example of unlawful retaliation. After the EEOC dismissed Russell's Charge in March, 2009, Krull sent an email stating, "I won."

Russell filed her initial complaint in this action on April 22, 2009, in the United States District Court for the Western District of Texas. The case was subsequently transferred to the Western District of North Carolina, and Russell filed an amended complaint on October 14, 2009. She alleges in the complaint violations of Title VII of the Civil Rights Act of 1964 and breach of contract. BSN has moved for summary judgment on each of Russell's claims.

## II. LEGAL STANDARD

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the Record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S. Ct. 2658, 2677, 557 U.S. ___ (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III. DISCUSSION

### A. Title VII claims

#### 1. Whether Russell was an employee or independent contractor

##### a. Legal framework

Russell alleges BSN subjected her to employment discrimination in the form of retaliation and sexual harassment, in violation of Title VII. BSN contends Russell lacks standing to maintain her Title VII claims because she was not BSN's "employee" as that term is used in Title VII. See Bryant v. Clevelands, Inc., 193 F.R.D. 486, 487-88 (E.D. Va. 2000) (explaining that a plaintiff bears the burden of demonstrating the court's subject-matter jurisdiction over a Title VII claim). The definitions provided in Title VII offer little guidance when, as is the case here, a plaintiff's status as a current or former employee is disputed. See 42 U.S.C. § 2000e(f) (defining an "employee" as

"an individual employed by an employer"); § 2000e(b) (defining an "employer" as "a person . . . who has fifteen or more employees").

Instead, courts presume that by using the term "employee," Congress intended to describe "the conventional master-servant relationship as understood by common-law agency doctrine." Cilecek v. Inova Health Sys. Servs., 115 F.3d 256, 259 (4th Cir. 1997) (quoting Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 322-23, (1992)). In other words, Russell's status as an "employee" for purposes of Title VII turns upon whether her relationship with BSN more closely resembled that of an agent or an independent contractor. Cilecek, 115 F.3d at 261 (citing MacMullen v. S. C. Elec. & Gas Co., 312 F.2d 662, 670 (4th Cir. 1963)). In Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730 (1989), the United States Supreme Court identified the following as factors often relevant to an agent/independent contractor inquiry:

> (1) the skill required; (2) the source of the instrumentalities and tools; (3) the location of the work; (4) the duration of the relationship between the parties; (5) whether the hiring party has the right to assign additional projects to the hired party; (6) the extent of the hired party's discretion over when and how long to work; (7) the method of payment; (8) the hired party's role in hiring and paying assistants; (9) whether the work is part of the regular business of the hiring party; (10) whether the hiring party is in business; (11) the provision of employee benefits; and (12) the tax treatment of the hired party.

Id. at 751-52; see also Farlow v. Wachovia Bank of North Carolina, N.A., 259 F.3d 309, 313 (4th Cir. 2001); Cilecek, 115 F.3d at 260 (Title VII cases quoting Reid). "No one factor is determinative, and the consideration of factors must relate to the particular relationship under consideration." Cilecek, 115 F.3d at 260. Thus, it is often appropriate to alter or supplement the Reid factors to fit the particular nature of the relationship examined. See id. at 260-61 (applying specifically tailored factors to determine employee status under Title VII). Often, however, the three most important inquiries are whether the defendant exercised significant control over the plaintiff's

8

hiring, firing, or working conditions. <u>Chapman v. Duke Energy Carolinas, LLC</u>, Doc. No. 3:09cv37, 2010 WL 411141, at *3 (W.D.N.C. Jan. 28, 2010) (citing <u>Paroline v. Unisys Corp.</u>, 879 F.2d 100, 104 (4th Cir. 1989), <u>aff'd in part</u>, 900 F.2d 27 (1990) (per curiam)). In addition, because applying these factors sometimes requires the Court to resolve factual disputes, the Court views this evidence and any inferences from the evidence in the light most favorable to the nonmoving party at the summary judgment stage. <u>See</u> <u>Anderson</u>, 477 U.S. at 255.

### b. Analysis

BSN contends Russell's status is analogous to that of the plaintiff in the <u>Farlow</u> case. In <u>Farlow</u>, the plaintiff was an attorney who worked for a private law firm and held Wachovia Bank as a client. 259 F.3d at 310. After Farlow left the law firm to begin a solo practice, Wachovia remained with her as a client, and later entered into an agreement with her to perform on-site legal work for the bank. <u>Id.</u> at 310-11. Farlow had no supervisor directing her legal work for Wachovia, and she was not provided with Wachovia business cards or letterhead. <u>Id.</u> at 313-14. Wachovia did not keep a file on Farlow's progress or performance, and Farlow held many clients other than Wachovia throughout her engagement with the bank. <u>Id.</u> at 312, 315. The agreement Farlow and Wachovia signed clearly indicated that it was an independent contractor agreement. <u>Id.</u> at 311 n.4. Further, Farlow knew she could not legally become an employee of the bank until she received clearance from the FDIC, because she had a prior conviction for larceny. <u>Id.</u> at 311. Finally, the parties' financial relationship was clearly that of an independent contractor and hiring party: (1) Farlow was not paid a salary but rather only by the hours she billed; (2) Wachovia did not withhold or pay taxes incident to an employment relationship; (3) Farlow did not receive benefits such as health or life insurance; and (4) Farlow filed tax returns under a self-employed status. <u>Id.</u> at 316. The only evidence of an employer-employee relationship was that Wachovia provided Farlow "with

instrumentalities such as a computer and did exercise control over some administrative details incident to her on-site work, such as monitoring her dress code, supplying some support staff, and controlling the hours she could use her office . . . ." Id.

Russell's status with BSN was quite different from that of Farlow's with Wachovia. Russell does share some significant similarities with Farlow in that she did not receive benefits, filed her taxes as self-employed, and BSN did not withhold or pay taxes subject to an employment relationship. But the instant case is unlike Farlow in critical respects. Russell was paid a regular monthly salary in addition to compensation for her sales. She used BSN business cards and letterhead. BSN kept an extensive file on Russell's performance, progress, and customer complaints, and ranked her in relation to her regional sales team and the national sales force. Further, Russell worked exclusively for BSN for much of seventeen years.[2] Russell further provides evidence that she would have been fired if she sold product lines other than those of BSN Medical.[3] (Doc. No. 29-20 at 4, Brown Affidavit).

Importantly, Russell had direct supervisors who exerted significant control over her selling activities. Russell was required to take part in conference calls with her supervisor and sales team, and she was reprimanded for entering one conference call late. BSN cited in its termination letter to Russell that a main reason for her termination was her failure to meaningfully participate in two

[2] BSN makes much of Russell's admission that she accepted a full-time position with Airrosti Rehab Centers for two or three months beginning in August 2008. However, BSN does not refute Russell's explanation that she took the position near the end of her time with BSN, knowing she would soon be terminated from BSN. This two-to-three month period of non-exclusivity does not detract from seventeen years of a largely exclusive working arrangement. It is undisputed that between at least 1996, when Smith & Nephew purchased Parker Medical (which later became BSN), and August 2008, Russell worked exclusively for BSN.

[3] BSN refutes this evidence with the language of the Agreement, which states Russell can be engaged as an independent contractor with other parties as long as it does not detract from her engagement with BSN or work in competition or to the detriment of BSN. The Court resolves this disputed fact in favor of Russell at the summary judgment stage, as she provides a third-party affidavit directly contradicting this language of the Agreement.

mandatory sales promotions, one of which did not involve actual sales, but rather required Russell to take pictures of old cast saws and turn them in to BSN. Russell attended mandatory BSN sales training conferences and received the same training and promotional materials that W-2 employees received. She also provides evidence that she was reimbursed for hotel, travel, and other expenses at a sales conference.

The <u>Farlow</u> court lent significant weight to the parties' "actual understanding of their working relationship." There, the attorney knew she could not be an employee because of the lack of FDIC clearance in the face of her criminal history, and Wachovia did not create or maintain a personnel file on the plaintiff. <u>See</u> 259 F.3d at 314-15. Here, there is little evidence of a subjective belief by either party that Russell was in practicality anything other than an employee. Both Krull and Keytel admit as much. Tellingly, when asked at deposition what differences there were between BSN's independent-contractor sales reps and employee sales reps, Keytel responded, "The biggest difference would be paperwork." (Doc. No. 29-12 at 35). When asked if there were any other differences, he answered, "No." (<u>Id.</u>). Krull admitted that the only differences between BSN's independent-contractor sales reps and employee sales reps were administrative responsibilities and paperwork. (Doc. No. 29-13 at 28).

While many factors, including BSN's significant control over Russell, indicate an employment relationship, the financial arrangement between Russell and BSN reflects that of an independent contractor and hiring party. BSN did not pay payroll taxes for Russell, and it did not grant her benefits like health or life insurance. Further, Russell filed tax returns under a self-employed status. As the <u>Farlow</u> court stated, "The failure of an employer to extend employment benefits or to pay any payroll taxes is highly indicative that the employee is an independent contractor." 259 F.3d at 315 (citation and internal quotation marks omitted). Yet while such an

arrangement can be a "virtual admission" of an independent contractor arrangement, "regular, periodic payments" provide indicia of employee status. Id. BSN paid Russell a regular monthly salary, which is a regular, periodic payment. Where the tax and benefits factors are the only strong factors indicating independence, "[t]here is a danger . . . in relying on them too heavily, because they do not bear directly on the substance of the employment relationship – the right to control." JustMed, Inc. v. Byce, 600 F.3d 1118, 1128 (9th Cir. 2010). Here, it is clear that BSN held and exercised a strong right to control Russell.

Russell signed an Independent Contractor / Sales Representative Agreement in September 2007 stating that she was considered by BSN as an independent contractor. This Agreement would normally serve as strong evidence of an independent contractor relationship. However, this Agreement, signed in late 2007, post-dates her complaints to Keytel of sexual harassment and retaliation by Krull at various points throughout that year. BSN had an obvious incentive from a legal liability standpoint to memorialize in writing that Russell was an independent contractor rather than an employee. This question is magnified by Russell's largely unrefuted claims that she was told multiple times she would be fired if she did not sign the Agreement by a specific date.[4]

The majority of the Reid factors weigh in favor of Russell as well. First, the same general skill was required of both independent contractors and employees. Despite BSN's contention, it is telling that Russell was replaced with someone considered an employee, but who held the same general responsibilities she held. Second, BSN provided the same promotional materials, business

_____

[4] BSN argues the Russell has not briefed the elements of duress, and that the Agreement is thus valid. Russell's failure to specifically brief the elements of duress does not, however, preclude the Court's consideration of this information in assessing the weight of the Agreement as a factor in the independent contractor / employee inquiry.

cards, letterhead,[5] and administrative support for all sales reps, whether termed independent contractor or employee. Third, all sales reps, whether independent contractor or employee, worked from home in an assigned sales territory. Fourth, Russell worked for BSN for a lengthy duration of nearly seventeen years. Fifth and sixth, BSN had significant authority to assign Russell additional projects and to require when and how long she should work. This authority is evidenced by the letter stating the reasons for Russell's termination, among other items, as Russell's poor performance in the cast saw photo-taking initiative, her failure to participate in a mandatory conference call, and her having turned in a mandatory report late. It is further demonstrated by Krull's demand on a Friday evening that Russell create a performance improvement plan by the following Monday, and her receiving of the Performance / Integrity Report and probation for, among other items, taking nineteen hours to respond to an email request from Krull. The Court need not look to every <u>Reid</u> factor, as not all are applicable to the facts of this case. The only two <u>Reid</u> factors that support BSN's position, however, are factors eleven and twelve – benefits and tax treatment – which the Court has already discussed.

Nearly all the evidence of record indicates BSN exerted a strong degree of control over Russell and the work she performed. The Court thus finds that an employment relationship existed. BSN even exerted control over Russell after it informed her of her pending termination. Perhaps most telling is a September 17, 2008, email from Krull to Russell, stating:

> Your employment will be honored until October 10th 2008 and you are required to perform as expected until then.
>
> Moving forward I also have the following expectations: . . . Inform me of all remaining workshops, Inservices and events that will require BSN representation. . . .

---

[5] Business cards and letterhead are "identifying marks that would normally be provided to employees." <u>Farlow</u>, 259 F.3d at 314.

> Summarize and submit your final Monthly report by COB Sept 31. . . . Respond too [sic], and participate in all company correspondence, emails, Phone calls, voice mails, etc . . . Your full cooperation is appreciated, I expect a reply that you understand these expectations.

(Doc. No. 29-8 at 4). This language, including the use of the term "employment," is that of a supervisor to an employee, not of a hiring party to an independent contractor. With the evidence and its inferences viewed in her favor, Russell was an employee of BSN, and she may assert claims under Title VII.

### 2. Sexual Harassment

Under Title VII, a plaintiff must file a charge of discrimination with the EEOC before filing a lawsuit. 42 U.S.C. § 2000e-5(e); Gilliam v. S.C. Dep't of Juvenile Justice, 474 F.3d 134, 139 (4th Cir. 2007). Further, a plaintiff is required to file a charge with the EEOC within the appropriate limitations period for each alleged unlawful act. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002); Jones v. Calvert Group, Ltd., 551 F.3d 297, 300 (4th Cir. 2009); accord 42 U.S.C. § 2000e-5(e)(1) (2006). Russell filed a charge with the EEOC on April 18, 2008.

There is a question as to whether Russell exhausted her administrative remedies regarding her sexual harassment claim. A charge is complete "only if it is 'sufficiently precise to identify the parties, and to describe generally the action or practices complained of.'" Jones v. Calvert Group, 551 F.3d 297, 299 (4th Cir. 2009) (citation omitted). "Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit." Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 963 (4th Cir. 1996). In Jones, the plaintiff filed a complaint with the state commission alleging race, age, and sex discrimination. 551 F.3d at 299. When she then received a negative performance evaluation, the plaintiff filed a second

14

charge with the state commission, stating, "I believe I am being forced to work in a hostile environment and subjected to differential treatment in retaliation for filing" the first charge. Id. After she was terminated, the plaintiff filed a charge with the EEOC, checking only the box for "retaliation." Id. at 301. The Court held the plaintiff had failed to exhaust her administrative remedies as to the race, age, and sex discrimination claims because the second state commission charge and the EEOC charge did not allege age, race, or sex discrimination, but rather alleged retaliation for filing a charge of age, race, and sex discrimination. Id.

Similarly here, the plaintiff's April 18, 2008 EEOC charge states:

I reported sexual harassment to Gary Keytel . . . . Shortly thereafter, I was approached by Kenneth Krull . . . and told, 'what did you say about me to get me in trouble?' At every meeting, Kenneth brings up this situation. In January 2008, in front of a group of people he told me that I was inappropriately aggressive and he found it offensive . . . . In February 2008, Gary Keytel appointed Kenneth my immediate supervisor who has berated me, finds fault with everything I do; creates a hostile work environment, intimidates me; misrepresents me to Gary; has called [me] a liar. On 4/15/08 Gary, Kenneth and I had a conference call which resulted in me being put on probation by Kenneth.

I feel I have been retaliated against for protesting a protected activity, in violation of Title VII . . . .

(Doc. No. 29-6 at 12). Like Jones, this factual statement references a hostile working environment and retaliation for complaining of sexual harassment, but it does not specifically allege sexual harassment. The final sentence of the fact statement sums up Russell's EEOC charge, and it only alleges retaliation. This sole focus on retaliation is magnified by Russell's having checked only the "retaliation" box on the EEOC charge, like the plaintiff in Jones.

The Court holds that Russell has not exhausted her administrative remedies regarding her sexual harassment claim. Because Russell has not exhausted these remedies, the Court lacks subject

matter jurisdiction over the claim. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998). The Court will thus dismiss Russell's claim for sexual harassment in violation of Title VII.

### 3. Retaliation

Russell alleges BSN retaliated against her on multiple occasions after she complained of sexual harassment and Krull's hostility toward her based on her gender. BSN does not contest whether Russell exhausted her administrative remedies as to this claim.

A plaintiff may pursue a claim for retaliation under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 656 (4th Cir. 1998). The plaintiff must first establish a prima facie case of retaliation. Dowe, 145 F.3d at 656. If the plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate a non-retaliatory reason for its actions. Id. Finally, if the employer meets this burden of production, then the plaintiff must prove by a preponderance of the evidence that the proffered reason is actually a pretext for unlawful retaliation. Rhoads v. FDIC, 257 F.3d 373, 392 (4th Cir. 2001).

### a. Prima facie retaliation

A prima facie case of retaliation under Title VII requires that a plaintiff prove (1) that she engaged in a protected activity; (2) that her employer took an adverse employment action against her; and (3) that a causal connection exists between the protected activity and the asserted adverse employment action. Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 188 (4th Cir. 2004) (citing Makey v. Shalala, 360 F.3d 463, 469 (4th Cir. 2004)). In order to establish a protected activity, a plaintiff must show (1) that she subjectively, "in good faith," believed her employer was violating Title VII, and (2) that the belief was "objectively reasonable in light of the facts." Peters v. Jenney, 327 F.3d 307, 321 (4th Cir. 2003). General complaints of mistreatment, without more,

do not give rise to protected activity.  See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998) (noting that Title VII is not a "general civility code for the American workplace").

In its brief supporting the instant motion, BSN only maintains that it had a legitimate, non-retaliatory reason for terminating Russell's employment and that this reason was not a pretext for unlawful retaliation.  BSN neither argues nor mentions the prima facie retaliation step of the burden-shifting analysis, and it thus concedes the point.  Regardless, the Court finds based on the evidence that Russell has met her burden of proving prima facie retaliation.

### b.  Legitimate nondiscriminatory reason

BSN has satisfied its burden of producing a legitimate, nondiscriminatory reason for Russell's termination.  However, termination from employment is not the only adverse employment action Russell claims to have suffered.  Russell points to Krull's placing her on probation and giving her a negative performance evaluation (the Report) after she complained to Keytel of Krull's alleged harassment and retaliation.

"A downgrade of a performance evaluation could effect a term, condition, or benefit of employment if it has a tangible effect on the terms or conditions of employment."  James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 377 (4th Cir. 2004) (citations and internal quotation marks omitted).  However, a negative evaluation is only actionable "where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment."  Id.  Where an evaluation merely causes a loss of "prestige or status," it is not actionable.  Id.  Likewise, where an employee's probation has a tangible effect on the terms or conditions of employment, it may be considered an adverse employment action.

BSN focuses only on Russell's termination, failing to articulate a legitimate, non-discriminatory reason for the negative evaluation and probation in its briefs.  There is a genuine

issue of fact as to whether BSN used the Report to detrimentally alter the terms and conditions of Russell's employment. As the termination letter from Keytel states, "As I reviewed in July, earlier this year, Mr. Krull provided you with detailed feedback concerning numerous customer complaints that we had received, your apparent lack of responsiveness to customer and BSN requests." (Doc. No. 29-4 at 41). This statement looks to refer to the April 15, 2008, Performance / Integrity Report. Thus there is a triable issue of fact whether BSN used the Report as a basis for her termination. If it did, then the Report would be an adverse employment action.

Still, while BSN fails to brief the matter, the Report itself articulates legitimate, non-discriminatory reasons for Russell's probation and eventual termination. It is a report of Russell's alleged failure to respond to customer inquiries and complaints, as well as other alleged problems with her job performance. Therefore, BSN has articulated legitimate, non-discriminatory reasons for Russell's termination, as well as for the Report and Russell's alleged probation.

### c. Evidence of pretext

The final step of the <u>McDonnell Douglas</u> burden-shifting framework requires Russell to prove by a preponderance of the evidence that BSN's legitimate, non-retaliatory reason for the adverse employment actions she allegedly suffered were mere pretext for unlawful retaliation.

BSN argues Russell has provided only her own unsubstantiated opinions that BSN's reasons for her termination were pretext for retaliation. Were BSN's position accurate, Russell's claims would not survive summary judgment. <u>See</u> <u>Williams v. Cerberonics, Inc.</u>, 871 F.2d 452, 459 (4th Cir. 1989) (holding j.n.o.v. appropriate where plaintiff presented no evidence to support her retaliation claim other than her own assertions). However, Russell provides sufficient evidence from which a reasonable jury could find BSN's reasons for terminating her employment are pretext for unlawful retaliation.

First, Keytel explains in the termination letter that the reasons for Russell's termination include her negative performance in ongoing sales initiatives and negative feedback from customers. However, Russell provides evidence that she ranked ahead of a number of her peers in the sales initiatives by the time of her termination, and that she performed relatively well in her overall sales in 2008. A statement in an email from Krull to Keytel belies the notion that Russell was performing poorly. After receiving an email from Russell reporting positive sales activity, Krull wrote to Keytel on May 23, 2008: "How do you want me to handle the response to this, I was concerned about a performance upswing adding leverage to her position." (Doc. No. 29-13 at 41). This statement of a sales supervisor "concerned" about positive sales from one of his employees because it will "add leverage to her position" tends to support the notion that Russell's alleged negative performance is pretext for retaliation. A reasonable jury could certainly find as much. It is notable that only a month earlier, Keytel wrote to Russell in an April 19, 2008, email: "I expect to see a turn around . . . . It's very simple, get your sales numbers up . . . . I want to see concrete sales and area coverage plans and a quick performance upswing." (Doc. No. 29-6 at 7). For Krull to share with Keytel his concern about Russell's meeting Keytel's expectations, which Keytel had voiced only a month earlier, raises a genuine issue of fact as to the veracity of BSN's position. In addition, Krull's statement to Keytel came only one day after Russell filed a charge with the EEOC on April 18, 2008. A reasonable jury could find the timing of the statement supports a retaliatory motive.[6]

Further, the extent of Russell's negative customer feedback is also a genuine issue of fact. Russell provides evidence that Krull altered an email from a customer before forwarding it to

---

[6] Timing alone is not sufficient evidence to survive summary judgment. See Wagner v. Wheeler, 13 F.3d 86, 91 (4th Cir. 1993); Smith v. R.J. Reynolds Tobacco Co., No. 1:02cv63, 2003 WL 355646, at *5 (M.D.N.C. Feb. 11, 2003); Martin v. Nationwide Mut. Ins. Co., No. 1:99cv956, 2001 WL 604192, at *9 (M.D.N.C. Apr. 20, 2001). Timing is far from the only evidence here. It rather serves as an additional piece of evidence from which a jury could find pretext.

Keytel, in order make Keytel believe Russell was unresponsive to a customer. While Krull maintains he was merely correcting the customer's typo, in the light most favorable to Russell, Krull's actions are deliberate deceit from which a jury could infer a retaliatory motive. In addition, this instance detracts from the legitimate, nondiscriminatory reason offered by BSN that Russell was unresponsive to customer complaints.

BSN argues that even if Krull retaliated against Russell, Keytel was the only BSN employee with authority to terminate Russell's employment. Generally, a company cannot be held liable under Title VII for an employee with "no supervisory or disciplinary authority and who does not make the final or formal employment decision." See Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 291 (4th Cir. 2004). It is not enough that the person "had a substantial influence on," or even played a significant role in, the ultimate decision. Id. There is a question of fact regarding Krull's role as decision-maker, as Krull was Russell's direct supervisor and the manager of the entire sales team for the south region. Further, even if Krull had no final authority to terminate Russell's employment, his alleged dishonesty in altering the email, on which Keytel relied in Russell's termination letter, raises a fact issue regarding whether Keytel merely rubber-stamped a decision by Krull to terminate Russell. See id. (citing as actionable a case where "the supervisor's reports and recommendation were merely rubber-stamped by the formal decisionmaking committee") (citation omitted).

Even if a jury were to find (1) Krull had no authority to terminate Russell and (2) Keytel did not merely rubber-stamp Krull's decision, BSN can still be held responsible for the alleged adverse employment action in the form of the Performance / Integrity Report. As the Court has discussed, a jury could find the Report materially altered the terms and conditions of Russell's employment. Because Krull, a supervisor, had the power to create the Report, BSN can be held liable for his

actions if Keytel's using the Report as cause for Russell's termination would be "materially adverse to a reasonable employee." See Burlington N. & Santa Fe R.R. Co. v. White, 548 U.S. 53, 57 (2006).

Because there are genuine issues for trial regarding the pretext issue, the Court will deny BSN's motion as to Russell's retaliation claim.

**B. Breach of Contract**

Russell alleges BSN breached its payment agreement with her in two ways. First, Russell claims BSN failed to properly pay her for indirect sales she earned while working at BSN. Second, she maintains BSN breached the implied duty of good faith and fair dealing by intentionally terminating Russell's employment shortly before Russell's long-term client, University, renewed its large contract. BSN seeks summary judgment on the breach of contract claims, contending Russell offers no evidence other than her own sworn testimony.

Russell provides scant evidence in support of her claim for unpaid indirect sales commissions. Russell claims that BSN failed to pay her for certain indirect sales to her customers, which only would have been discovered by BSN after Russell's termination. However, other than a general allegation that some money is owed, Russell provides no information regarding the specific indirect sales for which she is allegedly owed a commission. Without evidence other than her own affidavit, Russell has failed to raise a genuine issue of material fact regarding her indirect sales claim.

Russell also claims BSN breached its implied duty of good faith and fair dealing as to the commission structure of the employment contract. "In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement. " Bicycle Transit Authority v. Bell, 333 S.E.2d 299, 305

21

(N.C. 1985) (citation omitted). Russell alleges she worked to renew a large indirect sales contract with University Health System, but that BSN waited until after her termination to sign the agreement. Russell contends this delay by BSN breached the duty of implied good faith and fair dealing, because BSN delayed so that it could avoid paying Russell a commission on the sale. However, Russell cites no record evidence of BSN's motives or even that it took longer than normal to complete the sale. Rather, Russell offers only a conclusory allegation that "[c]ommunications from [the client] to Russell suggest that BSN had been stalling in returning the signed contract." (Doc. No. 29 at 15). This allegation falls far short of the evidence required to sustain the claim.

Russell has failed to produce evidence from which a reasonable jury could find that BSN either failed to properly compensate her for indirect sales or breached its implied covenant of good faith and fair dealing. The Court will thus grant BSN's motion regarding Russell's breach of contract claims.

## IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that BSN's motion for summary judgment (Doc. No. 24) is **GRANTED IN PART and DENIED IN PART**, that is:

1. **GRANTED** as to Russell's claims for sexual harassment and breach of contract; and

2. **DENIED** as to Russell's claim for retaliation in violation of Title VII.

**SO ORDERED.**

Signed: June 11, 2010

Robert J. Conrad, Jr.
Chief United States District Judge